Middleton v. Commonwealth.

CASE 42.—PROSECUTION AGAINST WALTER MIDDLETON FOR MURDER.—January 27, 1910.

## Middleton v. Commonwealth

Appeal from Bell Circuit Court.

W. T. Davis, Circuit Judge.

Defendant convicted and appeals.—Affirmed.

1. Criminal Law—Appeal—Instructions—Reversible Error.— Under Cr. Code Prac. Sec. 225, directing the manner in which instructions shall be given, while it is bad practice to give additional instructions after the argument has commenced it is not ground for reversal.

2 Criminal Law—Appeal—Instructions—Reversible Error.—Ordinarily, the giving of an unauthorized instruction is ground for reversal.

3. Homicide—Instructions—Harmless Error.—In a trial for homicide, where all the evidence showed that the parties were always at least 100 yards apart from the time the trouble began until deceased was killed and the jury had only to determine who commenced the difficulty and who fired the first shot, an instruction that if defendant commenced, or willingly engaged in, the conflict with deceased with the intention of doing him bodily harm, and continued the conflict up to the time of the killing, the plea of self-defense was not available, neither aided nor hindered the jury, and hence, though unnecessary was not prejudicial.

4. Criminal Law—Trial—Instructions.—The refusal of an instruction not warranted by the facts proven is proper.

5. Homicide—Sufficiency of Evidence—In a trial for murder, evidence held sufficient to support a conviction.

6. Criminal Law—Appeal.—Where it appears that accused has had a substantially fair trial of the merits of his case, a conviction should not be disturbed on appeal.

W. F. HALL and E. N. INGRAM for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General for the Commonwealth.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Walter Middleton and his two cousins were indicted by the grand jury of Harlan county for the murder of Harmon Scott. Appellant, Walter Middleton, was given a separate trial in the Harlan circuit court, and the jury failed to agree. The case was then transferred to the Bell circuit court, and in a trial in that court held in April, 1909, the jury again failed to agree. For the third time the case was called for trial at the September term, 1909, at the Bell circuit court, and upon this trial appellant was found guilty and given a lifetime imprisonment.

He seeks to reverse the judgment predicated on that finding of the jury on the ground that the court erred in instructing the jury, and also that the court committed error in rewriting one of the instructions after the case had been partially argued. The question raised by this last ground for reversal has heretofore been before this court, and we will dispose of it before entering upon a consideration of the correctness of the instructions given. Section 225 of the Criminal Code of Practice directs the way and manner in which instructions shall be given by the trial court, and, in construing this section as applicable to cases where conditions have arisen to those under consideration, it has been expressly held that, while it is bad practice to give additional or explanatory instructions after the argument has commenced, it is not ground for reversal so to do. McDaniel v. Commonwealth, 6 Bush, 326; West v. Commonwealth, 20 S. W. 219, 14 Ky. Law Rep., 217.

Appellant is not complaining that the instruction as rewritten by the judge and as given to the jury is

not in form, but merely questions the right of the
trial judge to do so.   Under the decisions above re-
ferred to, this error will not authorize a reversal,
and hence, unless his objections to the instructions as
given, and particularly No. 7, are well taken, or un-
less he was entitled to an instruction authorizing him
to act in defense of his cousins as well as himself, the
judgment must be affirmed.   Not only does appellant
challenge the correctness of instruction No. 7 as
given but stoutly contends that, under the proof, it
should not have been given at all, and that in lieu
thereof he was entitled to have given to the jury an
instruction directing his acquittal if he was acting in
the defense of his cousins.   To pass upon these ques-
tions correctly it becomes necessary to consider the
evidence in detail.

Appellant and his cousins lived with his father on
Martin's fork, of the Cumberland river, in Harlan
county, Ky.   The deceased, Harmon Scott, lived with
his mother, in Lee county, Va., near the Kentucky
state line.   On Saturday, September 14, 1907, he
came across Stone Mountain into Kentucky to a meet-
ing that was being held on Martin's fork.   After the
services were over, he went down Martin's fork to
Bascom Saylor's still to get some whisky.   He had
with him some $6 or $7, a 45-caliber revolver, and a
pair of saddlebags.   Appellant and his two cousins,
who were indicted with him, had gone down Martin's
fork to John Scott's store in the afternoon, some lit-
tle time before deceased went down that way.   John
Scott is a brother of the deceased, Harmon Scott.
Appellant carried with him a Winchester rifle, and at
least one, if not both, of his cousins had a shotgun
as they went from home, and both of them had shot-
guns as they returned.   Whether John Middleton

had his shotgun as he went down to the store or not is disputed. By the time deceased got to Saylor's house, the Middleton boys had not started back up the fork. The stillhouse was down the creek from Saylor's house, and there were two ways of reaching it, one by the road, and another and shorter way through the field. Saylor told deceased to go around the road, as he was on horseback, and he would go through the field and meet him there and accommodate him. As deceased rode off down the road to go to the still, the Middleton boys were seen coming through the field from the stillhouse to Saylor's house. Whether or not they saw deceased as they came up is not shown, but they could have seen him had they looked in his direction, as the way was clear. Deceased went on to the still and bought and paid for a quart and a pint of whisky, put the bottles in his saddlebags, took a drink of whisky from a cup, and started shortly thereafter back up the creek in the direction from which he came. After going about 250 or 300 yards, he overtook and passed the Middleton boys near the home of Anthony Ely, a brother-in-law of appellant, and, according to the testimony of appellant and his cousins, nothing out of the ordinary passed between them, and he rode on out of sight. Shortly after he passed, they say that John and Tom Middleton fired their shotguns at a bush on the roadside toward the river, and that very soon thereafter deceased appeared in the road about a hundred yards away and headed toward them, and commenced firing his pistol at appellant. This fire was returned by all three of the Middleton boys, and deceased ran away. They continued on their way up the creek and soon came within sight of deceased

again, and again he opened fire on appellant, who was somewhat in advance of his cousins. After he had fired at appellant, and while in the act of firing again, appellant fired two shots at him, and he disappeared over a knoll or hill in the road from view. Mrs. Surginer, a witness for the commonwealth, who lives between Anthony Ely's and the home of appellant's father, testifies that her attention was attracted to the road by the shots, and upon looking in that direction she saw deceased running his horse up the road, and appellant and one of his cousins running after and shooting at him as he galloped away. Many witnesses testify that shortly after the Middleton boys had gone up the creek they heard shots, first two heavy shots, then many shots, heavy and light, and a little later two light shots, that seemed to be further away, and that cracked like a rifle. Shortly after the shooting ceased, Lewis Smith came up to appellant and his cousins in the road, and together they went on toward appellant's father's house. which was the direction in which deceased had gone. Soon they came upon his saddlebags in the road. A short distance beyond they found his dead body lying in the road. His pistol, lying near him, was cocked, and three empty and three loaded hulls were found in it. An examination of his body showed that he was shot in the back by a 32-caliber bullet, and that the shot ranged up, went through his heart, and lodged in the breastbone, which shot, according to the testimony in the case, produced instant death. Upon discovering the body the Middleton boys went home. The commonwealth proved, by one Hensley, that he had heard appellant threaten to kill deceased, a short time before, the next time he went up a certain branch. Several witnesses

testify that the character of appellant and his cousins was bad.

This, in substance, is the evidence upon which the court gave the instructions usually given in a murder trial, on murder, manslaughter, and self-defense, with the instruction to find the accused guilty of manslaughter if in doubt as to the degree of his guilt. No fault is found with any of these instructions, and, indeed there could well be none, as they are aptly drawn.

In addition to these, the court gave two other instructions, Nos. 6 and 7. No. 6 is clearly in appellant's favor, and no complaint is made of it. In No. 7 the court, in substance, told the jury that if they believed from the evidence, beyond a reasonable doubt, that defendant commenced, or willingly and mutually engaged in, the conflict with the deceased with the intention to do him bodily harm, and continued and urged said conflict up to and including the time defendant shot and killed deceased, if he did so shoot and kill him, he could not avail himself of the plea of self-defense. We are of opinion that it was unnecessary to give this instruction, and, while ordinarily the giving of an unauthorized instruction is ground for reversal, after a careful examination of the evidence in this case we are of opinion that the substantial rights of appellant were not prejudiced, and, this being so, the case should not be reversed because this instruction was given. If the parties had been near enough to each other to have left in the minds of the jury any doubt as to the manner in which the conflict was commenced or carried on, or there had been any words passed between them prior to the trouble or while it was in progress, then the jury might have been misled by this instruction. But

since all of the evidence shows that these parties were always at least a hundred yards apart, from the time the trouble began until deceased was killed, the jury had only to determine who commenced the difficulty, who fired the first shot, who was at fault; and, in arriving at this conclusion, the instruction complained of neither aided nor hindered the jury, and hence was not prejudicial.

There is no merit in the contention of appellant that the trial court should have given him an instruction authorizing him to, and justifying him if he did, shoot in defense of his cousin, because there is no evidence upon which to base such an instruction. Appellant was asked why he fired when he did upon each occasion that he fired, and he testifies positively and clearly that he fired in defense of himself. Nowhere does it appear that he regarded his cousins in danger of being shot by deceased, and nowhere does it appear that deceased was shooting at his cousins. On the contrary, it is made clear from the testimony of appellant, and his cousins as well, that deceased was firing at appellant. This being so, and appellant admitting that he was shooting at deceased because he believed that his own life was in danger, the court did not err in failing to give an instruction which was not warranted by the facts proven.

The case, while not complicated, is rendered difficult because of the conflict in the testimony of the witnesses upon the vital point. If appellant and his witnesses are to be believed, deceased was shot down by appellant after he had made two murderous assaults upon him with a heavy or large revolver. While, on the other hand, if the testimony offered by the commonwealth is true, deceased was killed while he was making an effort to escape. He was shot in

the back. Of this one fact there is no doubt, and this point tends most strongly to corroborate and substantiate the testimony of Mrs. Surginer, who says that when they passed her house deceased was riding rapidly away and being pursued and fired at by appellant and his cousins. The theory of the commonwealth is supported by evidence amply sufficient to uphold the verdict of the jury, which must have been influenced in large measure by the fact that deceased was shot in the back; and although appellant attempts to account for this by saying that, while he was shooting at appellant, his horse was rearing and plunging, and intimates that it must have whirled so that deceased's back was turned toward appellant just as he fired the last shot, this idea evidently did not impress itself upon the minds of the jury, and they accepted the testimony of Mrs. Surginer as true and on it based their finding and verdict.

An examination of the record shows that in the conduct of the trial no difficult questions were presented to the court, and but few objections made to the introduction of testimony, and that such as were made bore upon immaterial or inconsequential points. We find no prejudicial error committed during the conduct of the trial, and, as said by this court in the case of Mullins v. Commonwealth, 108 S. W. 252, 32 Ky. Law Rep. 1216, and again in the case of Collett v. Commonwealth, 121 S. W. 426, and recently emphasized in the cases of Hargis v. Commonwealth (decided December 1, 1909) 123 S. W. 239, and Parrish v. Commonwealth (decided December 9, 1909) 123 S. W. 339, where it appears that the accused has had a substantially fair trial of the merits of his case, a judgment of conviction should not be disturbed.

Applying the same rule in this case, the judgment must be affirmed.